UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
ARCHIE MD, INC.,                      :
                                      :
        Plaintiff,                    :        16-cv-6614 (JSR)
                                      :
            -v-                       :        OPINION AND ORDER
                                      :
ELSEVIER, INC.,                       :
                                      :
        Defendant.                    :
--------------------------------------x

JED S. RAKOFF, U.S.D.J.

    In this action, plaintiff Archie MD, Inc. ("Archie") brings
suit against defendant Elsevier, Inc. ("Elsevier") alleging
infringement of its copyright in hundreds of 3-D medical animations
that it had previously licensed to Elsevier, breach of the parties'
license agreement, and misappropriation of its trade secrets. Both
parties move for summary judgment on the copyright infringement and
breach of contract claims, and defendant also moves for summary
judgment on plaintiff's trade secrets claim. In addition, defendant
moves to strike as untimely plaintiff's inclusion of 18 previously
unspecified animations in its copyright claim shortly before the
close of discovery. The Court now denies plaintiff's motion for
summary judgment in its entirety; grants defendant's motion for
summary judgment on plaintiff's contract claim and trade secrets
claim; grants defendant's motion for summary judgment on plaintiff's
infringement claim as to all animations except defendant's allegedly
derivative animations entitled "Blood Cell Formation" and "Types of
Blood Cells"; denies defendant's motion for summary judgment on

1

plaintiff's infringement claim as to those two allegedly derivative
animations, but, as required, refers to the Copyright Office the
initial determination whether the copyright registration covering
plaintiff's animation that those two animations allegedly infringe
is valid; and denies as moot defendant's motion to strike.

The pertinent facts, undisputed except where indicated, are as
follows:

Archie was founded in 2002 by Dr. Robert Levine, a board-
certified physician, who sought to create 3-D animations that
effectively convey complex medical concepts. Pl.'s Statement of
Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl.'s Rule
56.1 Stmt.") ¶¶ 1-4, ECF No. 38; Def. Elsevier's Local Rule 56.1
Statement of Material Facts Not in Dispute ("Def.'s Rule 56.1
Stmt.") ¶ 1, ECF No. 32.[1] Over time, Archie built a catalog of
animations that depict human anatomy, the occurrence of diseases,
and medical treatments. Pl.'s Rule 56.1 Stmt. ¶ 6; Def.'s Rule 56.1
Stmt. ¶ 1. Archie licenses those animations to educational and
commercial entities. Def.'s Rule 56.1 Stmt. ¶ 2.

Elsevier is a publisher of textbooks and other materials in the
fields of medicine, health, and nursing. Pl.'s Rule 56.1 Stmt. ¶ 9;
Def.'s Rule 56.1 Stmt. ¶ 4. It provides students and instructors
with access to digital content, such as animations, through an

---

[1] All citations to the parties' Local Rule 56.1 Statements are
undisputed in relevant part, unless otherwise noted.

online "learning management system" called "Evolve." Def.'s Rule 56.1 Stmt. ¶ 6.

On July 25, 2005, Archie and Elsevier executed an Animation License Agreement ("ALA"), under which Archie granted Elsevier a license to use its library of 3-D medical animations in connection with Elsevier's publications. Pl.'s Rule 56.1 Stmt. ¶¶ 15-16; Def.'s Rule 56.1 Stmt. ¶¶ 17[2], 35. Over the next ten years, the parties renewed the ALA twice, in 2008 and 2012, and supplemented it with addenda granting Elsevier licenses to use additional animations that Archie had produced. Pl.'s Rule 56.1 Stmt. ¶¶ 35-37, 39. In all, Archie provided Elsevier with more than 1000 animations. Pl.'s Rule 56.1 Stmt. ¶ 41.

Elsevier used the Archie animations in e-books, online courses, and online tests. Id. In addition, certain textbooks published by Elsevier allowed textbook users to view the animations online

---

[2] Archie objected to several of Elsevier's proffered undisputed facts, including this one, on the ground that the documents supporting those facts (which were attached as exhibits to defense counsel's declaration) were not properly authenticated. See Archie MD, Inc.'s Obj. to the Decl. of David A. Munkittrick in Supp. of Def. Elsevier, Inc.'s Mot. for Summ. J., ECF No. 51. However, changes to the Federal Rules of Civil Procedure in 2010 eliminated the requirement that evidence supporting a 56.1 statement must be authenticated. See Akers v. Beal Bank, 845 F. Supp. 2d 238, 243 (D.D.C.) ("[T]he 2010 amendments to Federal Rule of Civil Procedure 56 eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." (internal quotation marks omitted)), aff'd, 2012 U.S. App. LEXIS 20594 (D.C. Cir. Oct. 2, 2012). Rather, such supporting evidence must simply be in a form that, if authenticated, could be admissible at trial. See Fed. R. Civ. P. 56(c)(2). Archie's objection based on a purported failure to authenticate documents is therefore overruled.

through Evolve. Id. Evolve, which is located at the web address
evolve.elsevier.com, provides access to multiple companion sites,
each designed to accompany a particular textbook. Pl. Archie MD,
Inc.'s Resp. to Def. Elsevier, Inc.'s Local Rule 56.1 Statement of
Material Facts Not in Dispute ("Pl.'s Rule 56.1 Resp.") ¶ 12, ECF
No. 54; Def.'s Rule 56.1 Stmt. ¶ 12.  When a student purchases one
of the textbooks for which there are accompanying animations, she
receives a code with which she may log in to Evolve and access the
textbook's companion site, which features animations and other
digital materials corresponding to the textbook. Def.'s Rule 56.1
Stmt. ¶¶ 12, 13.

On August 15, 2005, shortly after the parties had executed the
ALA, Archie submitted its first copyright registration, applying to
register the animations it had licensed to Elsevier as a collection
of unpublished works. Def.'s Rule 56.1 Stmt. ¶¶ 92, 94. During the
term of the ALA, Archie filed four additional registrations for
collections of unpublished works comprising animations that it had
previously delivered to Elsevier. Def.'s Rule 56.1 Stmt. ¶¶ 97, 99,
102, 104, 108.[3]

---

[3] Archie's five copyright registrations at issue here were registered
as follows:
- Human Patient Simulation Model was registered on August 15,
  2005 under registration number PAu2-985-274, Def.'s Rule 56.1
  Stmt. ¶ 92.
- Human Patient Simulation Model 2 was registered on August 14,
  2006 under registration no. PAu3-118-099, id. ¶ 99.
- Human Patient Simulation Model 3 was registered on February 3,
  2009 under registration no. PAu 3-381-192, id. ¶ 102.

In June 2014, Elsevier notified Archie that it intended not to
renew the ALA, and the agreement terminated on July 1, 2015. Pl.'s
Rule 56.1 Stmt. ¶ 49; Def.'s Rule 56.1 Stmt. ¶¶ 75, 77. (While
Elsevier claims that it chose to end the agreement because Archie's
animations were no longer a good value, Archie asserts that Elsevier
intended to exploit the animations without paying for them.) To
replace Archie's animations, Elsevier decided to create its own, and
it hired a vendor, Trinity Animations ("Trinity"), to help it do so.
Pl.'s Rule 56.1 Stmt. ¶ 66; Def.'s Rule 56.1 Stmt. ¶ 169. Trinity
produced animations using multiple "references," including
textbooks, videos, and roughly 80 of Archie's animations that
Elsevier provided to it. Pl.'s Rule 56.1 Stmt. ¶ 69-70, 72; Def.'s
Rule 56.1 Stmt. ¶¶ 168, 172-73, 175-76. To date, Trinity has
produced 150 animations for Elsevier's use. Pl.'s Rule 56.1 Stmt. ¶
75. Since the termination of the ALA, Elsevier has removed some
Archie animations from Evolve, Pl.'s Rule 56.1 Stmt. ¶ 91, though
some such animations remain accessible, Pl.'s Rule 56.1 Stmt. ¶ 63.

Archie commenced this action on August 22, 2016, asserting
claims for: (1) copyright infringement, in violation of 17 U.S.C. §§
106 and 501; (2) breach of contract; and (3) violation of the Defend
Trade Secrets Act, 18 U.S.C. § 1836. See Compl., ECF No. 1. With
regard to the first claim, the complaint alleged infringement of "at

- Human Patient Simulation Model 4 was registered on June 14,
  2012 under registration no. PAu 3-648-251, id. ¶ 104.
- Human Patient Simulation Model 5 was registered on June 21,
  2014 under registration no. VAu 1-162-543, id. ¶ 108.

least 355 of Archie MD's copyrighted works" through Elsevier's use
of the works after the ALA expired on July 1, 2015, as well as the
creation of "unauthorized derivative works of at least 100 of Archie
MD's copyrighted animations." Compl. ¶ 35. The complaint did not
list the specific animations that it alleged Elsevier was
infringing, except by way of example. Rather than move to dismiss
the complaint, Elsevier requested that Archie produce a list of the
allegedly derivative Elsevier animations and the Archie animations
that were allegedly infringed upon. In its disclosures pursuant to
Federal Rule of Civil Procedure 26(A)(1) and supplements thereto,
Archie ultimately provided a list of 515 Archie animations allegedly
still in use by Elsevier, as well as 58 allegedly derivative
Elsevier animations. Decl. of David A. Munkittrick in Supp. of Def.
Elsevier, Inc.'s Mot. for Summ. J. dated Jan. 11, 2017 ("Munkittrick
Decl. dated Jan. 11, 2017"), Ex. 2 at Ex. A, B, ECF No. 33.

As noted, the parties cross-moved for summary judgment on
plaintiff's first two claims, and defendant also moved for summary
judgment on plaintiff's third claim. Under Rule 56(a) of the Federal
Rules of Civil Procedure, summary judgment is appropriate when the
"movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating
the absence of a genuine dispute of fact, see Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986), and, to award summary
judgment, the court must be able to find "after drawing all

6

reasonable inferences in favor of a non-movant" that "no reasonable trier of fact could find in favor of that party," Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). A fact is considered material "if it might affect the outcome of the suit under the governing law," and a dispute of fact is deemed "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted).

Turning first to Archie's claim for copyright infringement, to prevail on such a claim a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc., v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Elsevier argues at the outset that Archie cannot maintain a copyright infringement claim because Archie's copyrights for the animations at issue were not validly registered. See 17 U.S.C. § 411(a); Whimsicality, Inc. v. Rubie's Costume Co., Inc., 891 F.2d 452, 453 (2d Cir. 1989) ("[P]roper registration is a prerequisite to an action for infringement."). In particular, it argues that Archie registered the animations as collections of unpublished works after it had licensed the animations to Elsevier and thereby published them. Archie disputes that licensing its animations amounted to publishing them within the meaning of the Copyright Act, and, even if it did, Archie argues that such an error would not invalidate its registrations.

7

As it turns out, the Court need not rule on the validity of the registrations, for two reasons. First, assuming the copyrights are valid, Archie's infringement claim nonetheless fails on the merits as to all but two of the many animations at issue. Second, with respect to those two, the Court refers the issue of the validity of applicable registrations to the Copyright Office pursuant to the provisions of the Prioritizing Resources and Organization for Intellectual Property Act of 2008 (the "PRO IP Act"). Each of these points bears elaboration:

As to the merits of the infringement claim, Archie alleges infringement of its animations based on two theories: that Elsevier continued to use Archie's animations after the termination of the ALA and beyond the scope of the license provided therein, and that Elsevier copied Archie's animations when it created its own animations.

With respect to the first of these theories, where "the contested issue is the scope of a license, rather than the existence of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license . . . ." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998). "Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities." Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995). Under New York law, which the parties agree governs

the ALA, see Pl.'s Rule 56.1 Stmt. ¶ 34, "the best evidence of what
parties to a written agreement intend is what they say in their
writing. Consequently, a written agreement that is complete, clear,
and unambiguous must be enforced according to its terms." Keiler v.
Harlequin Enters. Ltd., 751 F.3d 64, 68-69 (2d Cir. 2014) (internal
citations omitted). "A contract is unambiguous when the contractual
language has a definite and precise meaning about which there is no
reasonable basis for a difference of opinion," whereas "ambiguity
exists where a contract's term could objectively suggest more than
one meaning to one familiar with the customs and terminology of the
particular trade or business." Id. When parties dispute the meaning
of a contract clause, the court must consider the clause "in the
context of the entire agreement," and if "consideration of the
contract as a whole will remove the ambiguity created by a
particular clause, there is no ambiguity." Law Debenture Trust Co.
of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010).

Section 4.3 of the ALA provides that, upon the ALA's
termination, Elsevier "shall remove [the animations] from
Publications in the form of electronically accessed websites or web
pages" upon the earlier of two dates: (i) "the date the content of
such website or webpage (or any underlying companion print
Publication) is updated or modified (other than de minimus [sic][4]
modifications)," and (ii) three years after termination. Decl. of

---

[4] The correct spelling would be "de minimis." Black's Law Dictionary
(10th ed. 2014).

Erin Ranahan in Supp. of Pl.'s Contentions in Mot. for Summ. J.
dated Jan. 11, 2017 ("Ranahan Decl. dated Jan. 11, 2017"), Ex. 1 at
5, ECF No. 40. The parties agree that Elsevier has continued to
provide access to Archie animations through Evolve after the ALA
terminated in July 2015. See Pl.'s Rule 56.1 Stmt. ¶ 87. They also
agree that some materials accessed through Evolve have undergone
changes that are not de minimis since that time. See id. ¶ 89. Thus,
what the parties dispute is primarily whether Evolve, as a whole, is
a "website" under § 4.3 of the ALA. If Evolve is such a website,
then the non-de-minimis changes to some of the materials on that
site would have triggered the obligation to remove all Archie
animations from Evolve, and Elsevier, by maintaining such animations
on Evolve, would have exceeded the bounds of the license agreement.
If Evolve is not such a website, then such a global obligation to
remove all Archie animations from Evolve would not exist.

Archie contends that Evolve is a website as that term is
commonly defined. See Summit Health, Inc. v. APS Healthcare
Bethesda, Inc., 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014) ("Words and
phrases are to be given their plain and ordinary meaning, and New
York courts will commonly refer to dictionary definitions in order
to determine that meaning."). In support of this argument, it relies
on several dictionary definitions of a website, such as "'[a]
collection of thematically related, hyperlinked World Wide Web
services, mainly HTML documents, usually located on a specific Web
server and reachable through a URL assigned to the site.'" Droplets,

Inc. v. E*trade Fin. Corp., 939 F. Supp. 2d 336, 355 (S.D.N.Y. 2013)

(quoting McGraw-Hill Dictionary of Scientific and Technical

~~Terms (6th ed. 2003)). Since Evolve is reachable through a URL~~

(viz., evolve.elsevier.com) and allows navigation through hyperlinks

to other web pages, Archie concludes that Evolve falls within that

definition.

Elsevier, however, argues that "website" here has a special

meaning under the ALA, and particularly under § 4.3, which in effect

defines Evolve not as a website, but rather as a "web portal"

through which textbook purchasers can access the specific companion

websites corresponding to their respective books. While Elsevier

also cites a dictionary definition, see Merriam-Webster's Collegiate

Dictionary (11th ed. 2003) (defining a portal as "a site serving as

a guide or point of entry to the World Wide Web and usually

including a search engine or a collection of links to other sites

arranged especially by topic"), the primary textual basis for this

argument is the ALA's reference to "websites" and "web portals" as

distinct. Specifically, the preamble to the ALA describes

"Publications" as comprising, among many other things, Elsevier's

"websites, web portals and other informational products and

services." Ranahan Decl. dated Jan. 11, 2017, Ex. 1 at 1. If,

therefore, "websites" and "web portals" are distinct, Elsevier

argues, the former must refer only to the companion sites. In turn,

§ 4.3 requires removal of animations from "Publications in the form

of electronically accessed websites or web pages" upon "the date the

content of such website or webpage (or any underlying companion print Publication)" is substantially modified. Id. at 5. Since Evolve, as a whole, does not have a particular companion print publication, Elsevier concludes that considering Evolve a website under § 4.3 would render the phrase "underlying companion print Publication" meaningless. Def. Elsevier, Inc.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Summ. J. Br.") at 16, ECF No. 31.

This textual argument dovetails with Elsevier's functional analysis of § 4.3's removal requirement. Elsevier argues that the removal requirement only makes sense if a "website" is the companion site to a print publication, since that reading allows Elsevier to provide continued access to Archie animations corresponding to existing Elsevier textbooks so long as those textbooks are in use and are not revised. For example, if Evolve provides access to Archie animations that accompany a nursing textbook, Elsevier should not be required to remove access to those animations upon a revision to a pharmacology textbook, or an update to the materials on Evolve accompanying such a textbook. On this reading, the three-year limit, which applies if no non-de-minimis change has been made to a website or companion print publication, sets an outer bound on continued use that approximates the usual life cycle of a textbook.

A contrary reading, advanced by Archie, would require the removal of all animations from Evolve as soon as any part of Evolve underwent any non-de-minimis change. Elsevier argues that, given the inevitability of changes to Elsevier's digital resources, Archie's

12

reading would render the three-year clause a nullity, since it is inconceivable that no substantial change to Evolve would occur in a three-year period. Moreover, the expected result from this reading is what § 4.3's grant of a continued license appears designed to prevent: the abrupt removal of all Archie animations from Evolve upon termination of the ALA.

Archie, for its part, contends that Elsevier's reading would effectively eliminate all but the three-year limit in Section 4.3, since Elsevier's books are rarely revised but rather are "static." Archie MD, Inc.'s Opp. to Elsevier, Inc.'s Mot. for Summ J. ("Pl.'s Summ. J. Opp.") at 26, ECF No. 57. Yet, even assuming the truth of that factual assertion (which is disputed, see Def. Elsevier, Inc.'s Resp. to Pl. Archie's Statement of Additional Undisputed Material Facts Pursuant to Local Rule 56.1 ¶ 63, ECF No. 61), on Elsevier's reading § 4.3 would still require the removal of Archie animations upon non-de-minimis changes to the companion websites.

The Court is persuaded that, in the context of the entire ALA, Evolve does not constitute a website subject to the removal requirements of § 4.3. To hold otherwise would, as a practical matter, render extraneous that section's three-year limit and largely diminish the relevance of the explicit connection between websites and companion print works. See LaSalle Bank N.A. v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (noting that, under New York law, a "contract should be construed so as to give full meaning and effect to all of its provisions" (internal

quotation marks omitted)). Moreover, understanding Evolve as a web portal (rather than a website) is consistent with the cited dictionary definitions and gives meaning to the ALA's distinct reference to both websites and web portals.

Since the Court finds the ALA unambiguous on this point, it need not address extrinsic evidence of the parties' intent, see Keiler, 751 F.3d at 69 ("New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence"), nor Archie's argument that principles of contra proferentem weigh against Elsevier's reading, cf. McCarthy v. Am. Int'l Grp., 283 F.3d 121, 124 (2d Cir. 2002) (noting that under New York law the contra proferentem principle requires "equivocal contract provisions" to be construed against the drafter"). Thus, because the Court concludes that Evolve is not a website under Section 4.3, Elsevier was not obligated to remove all Archie animations from Evolve upon the first non-de-minimis change to the materials thereon, and Elsevier's continued use of some Archie animations is within the scope of the license, subject to the requirements of § 4.3.

Although Archie does not explicitly argue in the alternative that, even assuming Elsevier's interpretation of "website" is correct, Elsevier has still violated the license granted by the ALA, Archie does claim that Elsevier has failed to remove Archie animations from companion sites following changes to those sites or

14

their corresponding print materials, which could trigger an
obligation to remove Archie animations from those specific websites.

Specifically, Archie first claims that new editions of
textbooks were released and yet Archie animations were still
accessible on the companion sites corresponding to those textbooks'
prior editions. Mem. of Law in Supp. of Pl. Archie MD, Inc.'s Mot.
for Partial Summ. J. ("Pl.'s Summ. J. Br.") 14-15, ECF No. 37. But
that in itself is not problematic if the editions are considered
distinct "print Publications" and have distinct companion websites,
as Elsevier maintains. Treating separate editions as distinct
publications is consistent with the logic of § 4.3, since it would
make no more sense to deprive purchasers of a particular textbook
access to its accompanying animations when a new edition of that
textbook came out than it would to do so when a new edition of a
different textbook came out. While Archie claims that different
editions share the same companion website -- in which case the
issuance of a new edition would constitute a change to an
"underlying companion print Publication" of, and necessitate removal
of animations from, the shared companion site -- it does not
substantiate this assertion. Specifically, Archie claims that the
companion websites for the 16th and 17th editions of Clayton's Basic
Pharmacology for Nurses are located at the same web address, viz.,
evolve.elsevier.com/Clayton, and that the same is true for the
second and third editions of DeWit's Medical-Surgical Nursing, whose
shared companion site is purportedly located at

evolve.elsevier.com/deWit/medsurg. See Pl.'s Rule 56.1 Stmt. ¶ 93
(citing Ranahan Decl. dated Jan. 11, 2017, Ex. 59, 60, 71, 72). But
in each case, Archie provides as evidence only an undated page from
the older edition of the textbook directing purchasers to the web
address in order to access online resources, see Ranahan Decl. dated
Jan 11, 2017 Ex. 71, 72, and a more recent email identifying that
address as the new edition's "marketing URL," see id. Ex. 59, 60.
This evidence does not show that the editions' respective companion
materials were available at the same address at the same time.

Additionally, Archie claims that an Elsevier animation replaced
an Archie animation on a companion website and yet the other Archie
animations on the companion website were not removed. See Pl.'s
Summ. J. Br. 15-16. Archie provides evidence that Elsevier added a
new animation to the companion site for the ninth edition of
Bonewit-West's Clinical Procedures for Medical Assistants while
Archie animations remained on the site. See Decl. of Dr. Robert
Levine dated Jan. 11, 2017 ("Levine Decl. dated Jan. 11, 2017"), Ex.
11 Pt. 1 at 2-33, Ex. 11 Pt. 2 at 2-19 (showing that, as of
September 29, 2016, the companion site contained Elsevier's
"Chemotherapy" animation along with 49 Archie animations), ECF No.
39.[5] Elsevier does not dispute that it made this single addition, but

_____

[5] Archie makes a similar but unsupported claim with regard to the
second Canadian edition of Jarvis's Physical Examination & Health
Assessment. Archie shows that, as of October 10, 2016, that book's
companion website featured notices indicating that new animations
were "coming soon," Levine Decl. dated Jan. 11, 2017, Ex. 31 at 14-
18, 46-47, but it fails to back up its claim that, by the fall of

it insists that such a change is a "de minimus [sic] modification"
under § 4.3 and therefore does not trigger an obligation to remove
all Archie animations from that textbook's companion site. Def.
Elsevier, Inc.'s Opp. to Archie MD, Inc.'s Mot. for Partial Summ. J.
("Def.'s Summ. J. Opp.") 22, ECF No. 50. "De minimis" may be defined
as "trifling," "negligible," or "so insignificant that a court may
overlook it in deciding an issue or case." Black's Law Dictionary
(10th ed. 2014). Archie argues that the removal or addition of an
animation cannot constitute a de minimis modification, since such a
change is readily noticeable and since, if that change does not
prompt § 4.3's removal obligations, it is not apparent what type of
change would. Yet even if that type of change might in some
instances result in a significant modification under § 4.3, the
scale here suggests that the change at issue was de minimis. The
addition of the Elsevier animation altered one of the fifty
animations available on the textbook's companion site, which also
included other resources besides animations. See Levine Decl. dated
Jan. 11, 2017, at Ex. 11 Pt. 1 at 2-33, Ex. 11 Pt. 2 at 2-19. Since
the addition of a single animation modifies only a minute fraction
of the materials on the companion site, the Court concludes that it

2016, "an Elsevier animation had replaced an Archie MD animation" on
that site, Pl.'s Summ. J. Br. 16 (citing Levine Decl. dated Jan. 11,
2017, Ex. 40 at ARCHIEMD_0003676), since a document with that Bates
Number is not contained in Exhibit 40 of the Levine Declaration. See
also Levine Decl. dated Jan. 11, 2017, Ex. 31 at 2-38 (providing
documents with Bates Numbers ARCHIEMD_0003643 through
ARCHIEMD_0003680 except for the document numbered ARCHIEMD_0003676).

constitutes a de minimis modification under § 4.3 that does not trigger removal obligations.

In sum, because "website" under § 4.3 of the ALA refers to the companion sites corresponding to Elsevier's textbooks, and because Archie has not shown that Elsevier has made non-de-minimis changes to those companion sites without removing the Archie animations therefrom, Archie's claim for copyright infringement fails to the extent it is based on Elsevier's continued use of Archie's animations.

The Court now turns to the other part of Archie's copyright infringement claim, which is Archie's claim that Elsevier, through Trinity, used Archie animations to create unauthorized derivative works in the form of 58 Elsevier animations. See Munkittrick Decl. dated Jan. 11, 2017 Ex. 2, Ex. B at 1-4 (providing a list of 58 allegedly derivative Elsevier animations and the Archie animations from which they were allegedly derived). To prove copyright infringement based on the production of an unauthorized derivative of a copyrighted work, a plaintiff must show "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993). Since Elsevier does not contest access for the purpose of this motion, see Def.'s Summ. J. Br. 19 n.12, the question is whether the 58 Elsevier animations that Archie alleges are unauthorized derivatives are substantially similar to Archie's animations.

Works are substantially similar if an "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) (internal quotation marks omitted). In other words, "the inquiry is whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992) (internal quotation marks omitted). That inquiry is "guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work, instructed by our good eyes and common sense." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010). The "inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work." Id. (internal quotation marks omitted).

In addition, courts sometimes apply a "more discerning" analysis in which they "attempt to extract the unprotectible elements from [their] consideration and ask whether the protectible elements, standing alone, are substantially similar." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995). Several limitations on protectability are relevant here. In accordance with the "idea/expression dichotomy," "the similarity between two works must concern the expression of ideas, not the ideas themselves." Peter F. Gaito Architecture, 602 F.3d at 67.

Under the scènes à faire doctrine, "elements of an image that flow
naturally and necessarily from the choice of a given concept cannot
be claimed as original." Bill Diodato Photography, LLC v. Kate
Spade, LLC, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005). The merger
doctrine provides another limitation: an expression is not
protectable if a "given idea is inseparably tied to [that]
expression," since "rigorously protecting the expression would
confer a monopoly over the idea itself." 4 Melville B. Nimmer &
David Nimmer, Nimmer on Copyright § 13.03(B)(3)(a) (2015); see also
N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc., 497
F.3d 109, 116-17 (2d Cir. 2007) ("To ensure free access to ideas,
courts have applied the merger doctrine such that even expression is
not protected in those instances where there is only one or so few
ways of expressing an idea that protection of the expression would
effectively accord protection to the idea itself." (internal
quotation marks omitted)). Nonetheless, courts must still evaluate
the similarity of each work as a whole, rather than comparing only
the copyrightable elements of each. Peter F. Gaito Architecture, 602
F.3d at 66.

While questions of substantial similarity "have traditionally
been reserved for the trier of fact," the Second Circuit has
"repeatedly recognized that, in certain circumstances, it is
entirely appropriate for a district court to resolve that question
as a matter of law, 'either because the similarity between two works
concerns only non-copyrightable elements of the plaintiff's work, or

because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" Id. at 63 (quoting Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983)).

Given the large number of works here at issue, neither party attempts to argue for or against the substantial similarity of each alleged derivative to an Archie animation. Nevertheless, the Court has very carefully reviewed all of the underlying animations and finds that, except for the Elsevier animations entitled "Blood Cell Formation" and "Types of Blood Cells," no reasonable factfinder could find any of the other Elsevier animations here at issue to be substantially similar to Archie's.

This is largely because the similarities between Archie's and Elsevier's respective animations predominately concern elements that are not protectable. Much of the appearance of the animations flows directly from the medical concepts that the animations seek to convey. Both Archie and Elsevier attempted to make their animations reflect anatomical relationships as accurately as possible. See Def.'s Rule 56.1 Stmt. ¶¶ 157, 179. The accurate depiction of an anatomical structure cannot itself be protected expression, since, as the merger doctrine dictates, no one may have a monopoly over the expression of a concept such as anatomy. See Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003) (holding that the plaintiff "may not prevent others from copying elements of expression that nature displays for all observers"). The same goes for the depiction of the proper position and sequence of actions in a given medical

procedure, which, thankfully for patients everywhere, likewise cannot be monopolized.

Several of the similarities identified by Archie in response to defendant's interrogatories involve the perspective from which the animations show the subject. See, e.g., Munkittrick Decl. dated Jan. 11, 2017, Ex. 4 at 14 ("Both animations share the same perspective showing the gallbladder from the upper left-hand side"); id. at 21 ("Both animations begin with a male model seated upright and provide a view of the model's left side"); id. at 25 ("The two animations show the identical perspective. Both zoom into the body, and lead to a zoomed in view of a capillary system."). Yet "similarities in orientation and camera angle" may be "so general that they rise to the level of unprotected ideas." Fulks v. Knowles-Carter, 2016 U.S. Dist. LEXIS 123150, at *10 (S.D.N.Y. Sept. 11, 2016). Archie does not allege that there is anything extraordinary about the angles employed in the animations. Cf. Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444, 455 (S.D.N.Y. 2005) (holding that the "relatively unusual angle" from which a photograph of a figure was taken contributed to the originality of the composition). Especially in this context, where a certain angle may be required to clearly depict the relevant anatomy or step in a procedure, Archie cannot show that its use of particular angles was original or unusually deployed.

Archie also identifies similarities in the backgrounds of animations. See, e.g., Munkittrick Decl. dated Jan. 11, 2017, Ex. 4

at 4 ("The Archie MD and Elsevier animations begin by depicting a
highly realistic setting of a Caucasian man being inserted into a CT
scanner, and the room where the scanner is located along with a
cabinet to its left, rather than demonstrating the process more
conceptually in a 3-D space."); id. at 17 ("The Archie MD animation
shows the relevant anatomy in 3-D space rather than within
the body. Elsevier mimics this decision."). But, of course, neither
the depiction of a figure in a realistic setting, such as an
examination room, nor one against a blank background is original to
Archie.

   The amount of protectable expression is therefore limited.
Moreover, when considering the works as wholes, the differences
between them so overwhelm any similarities that the "total concept
and overall feel" of the Elsevier animations is markedly different
from that of the Archie animations. Peter F. Gaito Architecture, 602
F.3d at 66. Elsevier's animations are generally brighter and feature
more vibrant colors than Archie's animations, many of which use dark
backgrounds and a muted palette of blues and grays. Compare
Munkittrick Decl. dated Jan. 11, 2017, Ex. 98 at 55, with id. at 56;
cf. Diodato, 388 F. Supp. 2d at 393 (noting that the different
lighting of two photographs weighed against finding them
substantially similar). Elsevier's animations also depict lifelike
human figures that have realistic skin tones and appear to be
breathing, whereas the figures in Archie's animations are far less
lifelike across the board and in several cases resemble mannequins

23

of unnatural blue and silvery hues. Compare Munkittrick Decl. dated
Jan. 11, 2017, Ex. 98 at 13, with id. at 17. Individual components
of anatomy, e.g., a heart, generally seem more realistic in
Elsevier's animations as well, as they appear more three-dimensional
and move more dynamically. Compare id. at 27, with id. at 28. In
sum, an ordinary observer would be quite unlikely to overlook the
dissimilarities between Archie's and Elsevier's respective
animations or to regard their aesthetic appeal as the same. See
Yurman Design, 262 F.3d at 111. Thus, the Court concludes that
Elsevier's animations identified supra are not substantially similar
to Archie's animations as a matter of law, and it grants defendant
summary judgment dismissing plaintiff's copyright claims based on
those animations.[6]

However, a reasonable factfinder could conclude that the
Elsevier animations entitled "Blood Cell Formation," see Munkittrick
Decl. dated Jan. 11, 2017, Ex. 99 at 26, and "Types of Blood Cells,"
see Munkittrick Decl. dated Jan. 11, 2017, Ex. 98 at 10, are
substantially similar to Archie's animation entitled "Cell
Differentiation," see id. at 9. Both Blood Cell formation and Cell
Differentiation initially depict an exposed bone and then zoom in on
that bone to present close up views of bone marrow, on the left side
of the screen, and lymph tissue, on the right, with labels for each

---

[6] Because the Court now dismisses Archie's copyright infringement
claim as it relates to the 18 Elsevier animations that Elsevier
alleges were untimely identified, the Court denies defendant's
motion to strike those animations as moot.

type of tissue in a blue header at the top of the screen. <u>Compare</u> Munkittrick Decl. dated Jan. 11, 2017, Ex. 99 at 25 from 0:00 to 0:15, <u>with</u> <u>id.</u> at 26 from 0:05 to 0:24.



*Archie's Cell Differentiation*   *Elsevier's Blood Cell Formation*

A single stem cell then appears at the top of the screen, and from it come a dozen different types of cells, which spring forth in exactly the same order and assume almost exactly the same positions on the screen in each animation. <u>Compare</u> <u>id.</u> at 25 from 0:20 to 1:35, <u>with</u> <u>id.</u> at 26 from 0:27 to 1:27.



*Archie's Cell Differentiation*   *Elsevier's Blood Cell Formation*

In contrast to the vast majority of the animations discussed above, in this instance most of the alleged similarity does not

arise merely from the subject matter itself. While the depiction of cells and tissue are informed by underlying anatomy, the sequence in which the animations depict the differentiation of a stem cell into different cells, and the arrangement of the resulting cells on the screen, are not dependent on any biological process.[7] Though Elsevier contends that it based its animation in part on an image from a textbook depicting stem cells and blood cells in a chart-like organization, Def.'s Rule 56.1 Stmt. ¶ 1136, the arrangement in that image is different from the one shared by Elsevier's and Archie's respective animations, see Munkittrick Decl. dated Jan. 11, 2017, Ex. 83 at 9. Moreover, the general aesthetic differences between the Archie and Elsevier animations are muted in this instance. While the Elsevier animation is brighter and less static than the Archie animation, it does not, for example, feature the lifelike human models that give many Elsevier animations a starkly different overall appearance from many Archie animations.

Elsevier's animation entitled Types of Blood Cells -- which is comparable to the second half of Cell Differentiation, whereas Blood Cell Formation is comparable to the first half -- could reasonably be found substantially similar as well, for the same reasons. It too mimics the arrangement of elements on the screen and, to a lesser

_____

[7] Elsevier contests this conclusion in its brief by arguing that displaying "the components of a stem cell in the same order and location" is an "unprotectable and unoriginal idea[] that flows naturally from the subject of blood cell formation," Def.'s Summ. J. Br. 26, but, tellingly, does not explain why this is so or cite any authority for that assertion.

extent, the sequence in which cells move about the screen. Compare
Munkittrick Decl. dated Jan. 11, 2017, Ex. 98 at 10 from 0:10 to
1:20, with id. at 9 from 1:40 to 2:59.



*Archie's Cell Differentiation*   *Elsevier's Types of Blood Cells*

The Court therefore concludes that there are disputed questions
of material fact as to whether the animations Blood Cell Formation
and Types of Blood Cells are substantially similar to Archie's
animation Cell Differentiation. Accordingly, the Court must now
address Elsevier's argument that Archie cannot proceed with its
copyright claim because it lacks valid copyright registrations
covering the two remaining animations at issue here.

As noted above, Elsevier contends that the relevant
registrations are invalid because Archie registered its animations
as collections of unpublished works when in fact it had previously
published the works by licensing them to Elsevier. See Family Dollar
Stores, Inc. v. United Fabrics International, Inc., 896 F. Supp. 2d
223, 230 (S.D.N.Y. 2012) ("[A] published design included in an
unpublished collection copyright registration application cannot be
registered as part of the collection."); 17 U.S.C. § 101 ("The

offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.").

The PRO IP Act, an amendment to the Copyright Act, provides that one may bring a claim for copyright infringement, "regardless of whether the certificate contains any inaccurate information, unless-- (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1). It further provides that, "[i]n any case in which inaccurate information described under [§ 411(b)(1)] is alleged, the court <u>shall</u> request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." § 411(b)(2) (emphasis added). Though § 411(b)(2)'s referral provision is rarely invoked, district courts have held that it is "mandatory in nature," <u>Palmer/Kane LLC v. Rosen Book Works, LLC</u>, 188 F. Supp. 3d 347, 348 (S.D.N.Y. 2016) (collecting cases), and the Seventh Circuit has found that a district court's invalidation of a copyright registration without following the procedure mandated by § 411(b)(2) constituted legal error, <u>DeliverMed Holdings, LLC v. Schaltenbrand</u>, 734 F.3d 616, 623 (7th Cir. 2013).

By its terms, § 411(b)(2) applies here. Elsevier has alleged "inaccurate information described under" § 411(b)(1), specifically, that Archie failed to state in its registration forms that it had previously published the works in the collections it sought to register. Def.'s Summ. J. Br. 10-13. Elsevier nonetheless argues that the PRO IP Act is inapplicable because the Act "solely concerns technical and minor errors with copyright registrations," whereas the error alleged here is material. Family Dollar, 896 F. Supp. 2d at 233. However, Family Dollar's discussion of the PRO IP Act does not bear directly on the analysis here, as the court there did not discuss the referral provision of § 411(b)(2). Rather, it addressed whether the error in a registration application was merely technical, in which case a showing of fraud on the Copyright Office would be required to invalidate the registration, or whether the error was material, in which case that requirement would not apply. Id. at 231, 233. Though the court, in the course of finding the defect material, did conclude that the inclusion of thirteen published designs with six unpublished designs in a registration for a collection of unpublished works was "not a minor technical error" and "would have clearly caused the Register of Copyrights to refuse to issue a registration," id. at 233, making that determination is not the province of the district court when it comes to applying the referral provision of § 411(b)(2). In DeliverMed, the Seventh Circuit decided that the district court should not have "relied upon its own speculation that" the Copyright Office would have refused

registration had it known of the inaccurate information in the application. 734 F.3d at 624. Even though, in that case, "[t]he district court's reasoning seem[ed] consistent with the Register's practice," nevertheless, "under section 411(b)(2), a court still must request a response from the Register before coming to a conclusion as to the materiality of a particular misrepresentation." Id.

Accordingly, the Court hereby requests the Register of Copyrights to advise the Court whether the fact that Archie had previously licensed its animations to Elsevier before applying to register them in a collection of unpublished works would have caused the Register to refuse registration of the collection including Archie's animation entitled Cellular Differentiation.

Turning now to the second cause of action, for breach of contract, Archie claims that Elsevier breached several provisions of the ALA: specifically, that Elsevier's continued use of Archie's animations on Evolve violated the removal requirement in § 4.3, and that Elsevier's providing of Archie's animations to Trinity as references violated the confidentiality provisions in § 6 and the prohibition on providing works for third party use in § 1.2.

The allegation of a breach of § 4.3 fails for the reasons identified previously: Elsevier's continued use of Archie's animations on Evolve was within the scope of the license granted by the ALA. Yet even if that were not the case, this claim would still fail, as it is preempted by the Copyright Act. The Copyright Act

expressly preempts a state law claim "if (i) the work at issue
'come[s] within the subject matter of copyright' and (ii) the right
being asserted is 'equivalent to any of the exclusive rights within
the general scope of copyright.'" Forest Park Pictures v. Universal
Television Network, Inc., 683 F.3d 424, 429 (2d Cir. 2012) (quoting
17 U.S.C. § 301(b)). Thus, for the state law claim to be preempted,
it "must not include any extra elements that make it qualitatively
different from a copyright infringement claim." Briarpatch Ltd., L.P
v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). "To
determine whether a claim is qualitatively different, [courts] look
at what the plaintiff seeks to protect, the theories in which the
matter is thought to be protected and the rights sought to be
enforced." Id. at 306 (internal quotation marks and alterations
omitted). Here, it is indisputable that Archie's contract claim in
this regard relates to copyrightable works, thus satisfying the
first criterion. And the claim concerns the same rights that
copyright law protects, viz., the ability to exclude others from
distributing or reproducing copyrighted works without authorization,
so the second criterion is satisfied as well.

Archie attempts to avoid this conclusion with a citation to
Second Circuit authority stating that "[a] claim for breach of a
contract including a promise to pay is qualitatively different from
a suit to vindicate a right included in the Copyright Act and is not
subject to preemption." Forest Park Pictures, 683 F.3d at 433. But
that case addressed different circumstances. There, copyright

31

holders disclosed their work to the defendant and, after the defendant appeared to use that work without seeking authorization or paying them, sought to recover on an implied-in-fact contract. Id. at 428. In other words, rather than seeking to bar others from using their work, they sought to be paid for such use. In contrast, while Archie had previously been paid for use of its works during the term of the ALA, there is no remaining "promise to pay," and Archie simply seeks to prevent Elsevier from further use, i.e., to enforce its exclusive right to the works in question.

This same preemption analysis applies to Archie's claim that the provision of animations to Trinity violated § 1.2 of the ALA,[8] under which Elsevier agreed "not [to] permit the use of the [animations] by any third party other than pursuant to" the license conferred by the ALA. Ranahan Decl. dated Jan. 11, 2017, Ex. 1 at 2. This claim also regards copyrighted works, and the right Archie asserts again comes down to the control of the reproduction and use of those works.

While Archie's breach of contract claim based on the disclosure of confidential information may not be preempted, see Gusler v. Fischer, 580 F. Supp. 2d 309, 319 (S.D.N.Y. 2008) ("Common law claims involving trade secrets or breach of confidentiality can be different in kind from copyright infringement and are not

---

[8] Elsevier protests that this claim was raised for the first time in Archie's motion for summary judgment, since the Complaint makes no mention of a violation of § 1.2, but in any case that objection is immaterial because the claim is preempted.

necessarily preempted by Section 301 of the Copyright Act."), it nonetheless fails on the merits. Under § 6 of the ALA, "[e]ach Party agrees to hold in confidence any and all confidential information disclosed to it." Ranahan Decl. dated Jan. 11, 2017, Ex. 1 at 7. However, "confidential information" does not include any information received by a party that "[is] now or [will] later become generally available to the public through no fault of the receiving Party." Id. at 7-8. Since the Archie animations were available to anyone who was willing to purchase an Elsevier product, they are excluded from the definition of confidential information by the plain text of the ALA. And, since this is the case, Archie's proffered evidence of Elsevier's awareness during negotiation of the ALA that Archie sought to protect the confidentiality of its animations, see Pl.'s Summ. J. Opp. 33, is not relevant. Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

Plaintiff's third claim is brought under the Defend Trade Secrets Act ("DTSA"), which allows the owner of a trade secret to bring a civil action for the misappropriation of that secret. 18 U.S.C. § 1836(b)(1). Here, Archie claims that its animations constitute trade secrets and that Elsevier violated the DTSA by disclosing them. Under the DTSA,

> [T]he term 'trade secret' means all forms and types of
> financial, business, scientific, technical, economic, or
> engineering information, including patterns, plans,
> compilations, program devices, formulas, designs, prototypes,
> methods, techniques, processes, procedures, programs, or codes,
> whether tangible or intangible, and whether or how stored,

33

compiled, or memorialized physically, electronically,
graphically, photographically, or in writing if –

    (A)   the owner thereof has taken reasonable measures to keep
        such information secret; and

    (B)   the information derives independent economic value,
        actual or potential, from not being generally known to,
        and not being readily ascertainable through proper
        means by, another person who can obtain economic value
        from the disclosure or use of the information.

§ 1839(3). It is clear that Archie's animations, as products that
Archie licensed and that were eventually distributed to consumers,
do not constitute trade secrets. See Lehman v. Dow Jones & Co.,
Inc., 783 F.2d 285, 298 (2d Cir. 1986) (finding that information
that plaintiff provided to defendant "[did] not fall within even the
broadest definition of a trade secret" because "the information at
issue [t]here was not used to run [plaintiff's] business but was its
*product*: like the car that rolls off the production line, this
information was what [plaintiff] had to sell" (emphasis in
original)). That the ALA contains an acknowledgement that
confidential information exchanged by the parties is a "valuable
trade secret" of its owner, Pl.'s Rule 56.1 Stmt. ¶ 31, does not
change the definition of a trade secret under the DTSA.

    Moreover, Archie has not "taken reasonable measures to keep
such information secret." 18 U.S.C. § 1839(3)(A). While Archie
attempts to argue that its animations were closely guarded and only
made available to certain users, it admits that anyone in the world
-- including one of Archie's competitors -- could purchase an
Elsevier textbook and access the corresponding Archie animations.

34

Def.'s Rule 56.1 Stmt. ¶¶ 125, 126 (citing Munkittrick Decl. dated
Jan. 11, 2017, Ex. 8 at 132:8-21). Accordingly, the Court finds that
Archie's animations do not constitute trade secrets under the DTSA
and therefore Elsevier is entitled to summary judgment on this
claim.

In sum, for the foregoing reasons, the Court denies plaintiff's
motion for partial summary judgment, grants in part and denies in
part defendant's motion for summary judgment, and denies defendant's
motion to strike as moot. In particular, the Court awards Elsevier
summary judgment dismissing Archie's claims for breach of contract,
violation of the DTSA, and copyright infringement as to all of the
animations at issue except for the allegedly derivative animations
entitled Blood Cell Formation and Types of Blood Cells. The Court
denies Elsevier summary judgment as to the copyright infringement
claim as to those animations and requests that the Register of
Copyrights advise the Court whether it would have refused
registration of the collection of works containing Archie's
animation Cell Differentiation. The Clerk of the Court is directed
to close document numbers 29 and 30 on the docket of this case.

SO ORDERED.

Dated:    New York, NY
          March 13, 2017                    JED S. RAKOFF, U.S.D.J.