**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ARCHIE MD, INC.,

          Plaintiff,

               v.

ELSEVIER, INC.,

          Defendant.

Case No. 16-cv-6614 (JSR)

---

## RESPONSE OF THE REGISTER OF COPYRIGHTS TO REQUEST PURSUANT TO 17 U.S.C. § 411(b)(2)

       The U.S. Copyright Office ("Copyright Office"), by and through its undersigned counsel, hereby responds to the question posed in the Order dated March 13, 2017.  This case appears to be a copyright infringement action in which an issue has arisen regarding what effect, if any, allegedly inaccurate information would have had on the Copyright Office's issuance of a copyright registration. Under 17 U.S.C. § 41l(b)(2), the Court is required to request the Copyright Office's advice on the question posed in this Court's order.  The answer of the Register of Copyrights to the question posed by the Court is attached as Exhibit A.

Dated: New York, New York
       June 16, 2017

                           Respectfully submitted,

                           JOON H. KIM
                           Acting United States Attorney for the
                           Southern District of New York
                           *Attorney for Non-Party U.S. Copyright Office*

              By:      /s/ *Leigh Wasserstrom*
                         LEIGH WASSERSTROM
                         Assistant United States Attorney
                         86 Chambers Street, 3rd Floor
                         New York, New York 10007
                         Telephone: (212) 637-3274
                         Facsimile:  (212) 637-2786
                         leigh.wasserstrom@usdoj.gov

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCHIE MD, INC.,

      Plaintiff,

        v.        Case No. 16-cv-6614 (JSR)

ELSEVIER, INC.,

      Defendant.

_____

RESPONSE OF THE ACTING REGISTER OF COPYRIGHTS
TO REQUEST PURSUANT TO 17 U.S.C. § 411(b)(2)

On March 13, 2017, pursuant to 17 U.S.C. § 411(b)(2), the Court requested advice from the Acting Register of Copyrights (the "Acting Register")[1] on the following question (the "Order"):

> [A]dvise the Court whether the fact that Archie had previously licensed its animations to Elsevier before applying to register them in a collection of unpublished works would have caused the Register to refuse registration of the collection including Archie's animation entitled Cellular Differentiation.[2]

As the Copyright Office understands the dispute, Defendant Elsevier, Inc., alleges that the audiovisual work titled "Cellular Differentiation" ("the Work") was published before Plaintiff knowingly registered it as part of an unpublished collection, and as such the registration is invalid. Defendant states that the Work existed at the time of license, thereby triggering publication prior to registration .[3]

Plaintiff Archie MD, Inc., responds that the Work was unpublished at the time of registration. Plaintiff provides three reasons: 1) because the Defendant, Elsevier, Inc., is not a "group of persons" under the definition of publication, 2) the license agreement placed two restrictions on

---

[1] The Librarian of Congress appointed Karyn Temple Claggett to the position of Acting Register of Copyrights on October 21, 2016. *See* Copyright.gov, About Us, https://www.copyright.gov/about/leadership/ (last visited June 12, 2017).

[2] Order at 30.

[3] Def. Elsevier, Inc.'s Mem. of Law In Support of Its Mot. for Summ. J., at 12 (Jan. 11, 2017)(alleging that "Archie published its animations by offering them for license and licensing them to Elsevier before registering them with the Copyright Office," and that the Work was in existence at the time of signing.).

1

Elsevier's use of the Work, and 3) the Work that was delivered to Elsevier at the time of signing was not ready for publication, and thus did not trigger publication.[4] The Acting Register addresses these allegations below, assuming without deciding the truth of the allegations.[5]

## BACKGROUND

A review of the Copyright Office's records shows the following:

On August 15, 2005, the Office received an application to register an audiovisual collection of "text, still images, and animations" titled Human Patient Simulation Model. The application identified Archie MD, Inc., as the work made for hire author and copyright claimant of the collection. The application stated that the collection was created in 2005, and that it was unpublished.  The Office registered the unpublished collection with an effective date of registration ("EDR")[6] of August 15, 2005, and assigned registration number PAu 2-985-274.[7] Based on the information provided in the application, the Office had no reason to question the representations in the application and accepted them as true and accurate.[8]

---

[4] Archie MD, Inc.'s Opp. to Elsevier, Inc.'s Mot. for Summ. J. at 18-19 (Jan. 25, 2017).

[5] Section 411(b) of the Copyright Act provides that a registration is valid even where it contains inaccurate information, unless the two conditions are met: (1) the inaccurate information was knowingly included on the registration application, and (2) the Register of Copyrights would have refused registration if she knew of the inaccuracy. In the Order, the Court made no finding as to whether the registration application contained inaccurate information regarding the publication status of the Work, or whether Plaintiff made those statements knowingly on the registration application. The Seventh Circuit has explained that while section 411(b)(2) "appears to mandate that the Register get involved" in any case in which an inaccuracy in a registration application is merely "alleged," her input "need not be sought immediately after a party makes such a claim" given the "obvious potential for abuse." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013). Instead, courts appropriately can require "that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." *Id.* at 625. In other words, a court can require a litigant to first "demonstrate that (1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office" before seeking the Register's advice as to "whether the inaccuracy would have resulted in the application's refusal." *Id.* To be sure, the plain text of section 411(b)(2) permits courts to seek the Register's advice based on a mere allegation that the registrant knowingly included inaccurate information in a registration application. In such cases, like the one here, the Register's response will assume the truth of those allegations, solely for purposes of determining whether the inaccuracies would have been material.

[6] The EDR is the date that the Office received a completed application, the correct deposit copy, and the proper filing fee.

[7] Letter from Archie MD, Inc., to U.S. Copyright Office, at 1 (Apr. 13, 2017) ("[T]he District Court requested that the Register of Copyrights review the validity of Copyright Registration No. Pau2-985-274.").

[8] The principles that govern how the Office examines registration applications are found in the *Compendium of U.S. Copyright Office Practices, Third Edition*, which is "an administrative manual" that "explains many of the practices and procedures concerning the Office's mandate and statutory duties under title 17 of the United States Code." 37 C.F.R. § 201.2(b)(7).  One such principle is that the Office generally "accepts the facts stated in the registration materials, unless they are contradicted by information provided elsewhere in the registration materials or in the Office's records."  COMPENDIUM (THIRD) § 602.4(D). Additionally, "the Office does not conduct investigations or make findings of fact to confirm the truth of any statement made in an application." *Id*. The application for registration number PAu 2-985-274 was filed in 2005.  The governing principles that the Office would have applied

## ANALYSIS

An application for copyright registration must comply with the requirements of the Copyright Act set forth in 17 U.S.C. §§ 408(a), 409, and 410. Regulations governing applications for registration are codified in title 37 of the Code of Federal Regulations at 37 C.F.R. §§ 202.1 to 202.21(2016). The principles that govern how the Office examines registration applications are found in the *Compendium of U.S. Copyright Office Practices, Third Edition* (*"Compendium"*). The statutory requirements, regulations, and *Compendium* practices most relevant to the Court's request are as follows:

## I.    Relevant Statutes, Regulations and, Agency Practices

### A.    *Fixation and Publication*

Under the Copyright Act, "[a] work is 'created' when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work."[9]  In pertinent part, the Copyright Act defines "publication," in turn, as

> The distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. [10]

As the Compendium explains, under the first sentence of this definition (the "distribution" prong), "publication occurs when one or more copies or phonorecords are distributed to a member of the public who is not subject to any express or implied restrictions concerning the disclosure of the content of that work."[11]  For example, "[s]elling copies of a textbook to a local school board constitutes publication of that work."[12]

The Copyright Office recognizes, however, that distribution of a work may *not* constitute publication in certain narrow circumstances.[13]  In particular, courts have recognized the doctrine of "limited publication" to account for situations where the author has restricted both the purpose

---

at the time of application are set forth in the *Compendium of U.S. Copyright Office Practices, Second Edition*. Throughout this response, however, the Office cites the current version of the *Compendium* because the relevant practices have not materially changed.

[9] 17 U.S.C. § 101 (definition of "created").

[10] 17 U.S.C. § 101 (definition of "publication").

[11] COMPENDIUM (THIRD) § 1905.1; *see also* H.R. REP. NO. 94-1476, at 138 (1976).

[12] COMPENDIUM (THIRD) § 1905.1.

[13] *See generally* COMPENDIUM (THIRD) § 1905.1.

and the recipients of the distribution.  A limited publication generally occurs when copies of a work are distributed "to a definitely selected group with a limited purpose and without the right of diffusion, reproduction, distribution or sale."[14]  For example, "[s]ending copies of a manuscript to prospective publishers in an effort to secure a book contract does not constitute publication."[15]

The second sentence of the "publication" definition (the "offering to distribute" prong) provides a somewhat limited exception to the general rule requiring actual distribution of the work.  Under it, the mere "offering" of copies of a work to "a group of persons" for "further distribution, public performance, or public display" constitutes publication; distribution itself is not required.[16]  The offering of a work to a *single* person for the enumerated purposes does not qualify.  For example, publication occurs "when a motion picture is offered to a group of movie theaters or television networks for the purpose of exhibiting or broadcasting that work."[17]

But, in the Office's view, the offering of copies of a work to a group of persons for further distribution *does not* constitute publication if the works are not in existence or are not ready for further distribution, public performance, or public display at the time the offer is made.[18]  For example, "[o]ffering to distribute a sound recording that has not been fixed in its final form does not constitute publication."[19]  Accordingly, when an agreement is entered into that grants rights to a work not yet in existence or a work that is incomplete at the time the agreement is signed, publication does not occur until the work has been created and is ready for further distribution.[20]

B.      *Registration requirements for the "unpublished collection" option*

An unpublished collection is "[a] registration accommodation by the U.S. Copyright Office for registering a number of unpublished works with one application, one filing fee, and one set of

---

[14] COMPENDIUM (THIRD) § 1905.1.

[15] COMPENDIUM (THIRD) § 1905.1.

[16] The Office understands the actual distribution of (in addition to the mere "offering to distribute") copies or phonorecords to a group of persons for the enumerated purposes also to constitute a publication under the statute. *See* PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT 3.3.2 (3d ed. Supp. 2011).

[17] COMPENDIUM (THIRD) § 1906.1.

[18] COMPENDIUM (THIRD) § 1906.3 ("[O]ffering to distribute copies or phonorecords constitutes publication, provided that the copies or phonorecords exist when the offer is made. Offering to distribute copies or phonorecords before they exist or before they are ready for further distribution, public performance, or public display does not constitute publication.").

[19] COMPENDIUM (THIRD) § 1906.3.

[20] U.S. Copyright Office, Analysis of Gap Grants Under the Termination Provisions of Title 17, at 1 (Dec. 7, 2010)("Until . . . a work is created, there is no copyright interest, no transfer of that interest . . . the grant is not executed until the work is created"), available at https://www.copyright.gov/reports/gap-grant-analysis.pdf. *See also Korman v. HBC, Florida, Inc.*, 182 F.3d 1291, 1294 (11th Cir. 1999)(stating that the term "[e]xecuted means 'carried into full effect'")(citing Black's Law Dictionary 567 (6th ed. 1990)).

deposit copies." [21] The unpublished collection option may not be used to register published works. [22]

The Copyright Office's regulations require applicants to make "[a] declaration that information provided within the application is correct to the best of [the applicant's] knowledge." [23] Generally, the Office "accepts the facts stated in the registration materials, unless they are contradicted by information provided elsewhere in the registration materials or in the Office's records." [24]

In responding to the Court's question, the Office applies the foregoing governing statutory and regulatory standards, and examining principles. The Office notes, however, that it is not unusual for the examiner to correspond with an applicant about factual assertions if the assertions appear to conflict with other information provided in the application materials.[25] Accordingly, if the Office becomes aware of an error at the time of application, such as whether the work was published, or has questions about facts asserted in the application, it provides the applicant an opportunity to correct the error or verify the facts within a specified period of time.[26] If the applicant responds in a timely fashion to the satisfaction of the Office, the Office can proceed with the registration. The Acting Register's response herein is thus premised on the fact that the error identified in the Court's question was not timely corrected through such a process.

## II.      Acting Register's Assessment of the Alleged Inaccuracy's Materiality

As noted above, the Order asks "whether the fact that Archie had previously licensed its animations to Elsevier before applying to register them in a collection of unpublished works would have caused the Register to refuse registration."[27] Without knowing more facts, it is not possible to answer that question definitively. To fulfill the requirements of section 411(b), however, the Acting Register of Copyrights offers the following advice on the various possibilities:

---

[21] COMPENDIUM (THIRD) Glossary.

[22] COMPENDIUM (THIRD) § 1106.1 ("All of the copyrightable elements that are otherwise recognizable as self-contained works must be unpublished . . . Works that do not satisfy these requirements cannot be registered as an unpublished collection. In particular, an applicant cannot use this option to register a number of published and unpublished works. If any of the works have been published, the applicant should not include those works in the claim.").

[23] 37 C.F.R. § 202.3(c)(2)(iii).

[24] COMPENDIUM (THIRD) §§ 602.4(D), 612.3 ("As a general rule, the Office will accept the applicant's representation that the work is published or unpublished, unless that statement is implausible or is contradicted by information provided elsewhere in the registration materials.").

[25] COMPENDIUM (THIRD) § 602.4(D).

[26] Generally, an applicant has 20 calendar days to respond via email, and 45 calendar days to respond via U.S. mail to questions concerning issues in the application materials. *See* COMPENDIUM (THIRD) §§ 605.6(B), 605.6(D).

[27] Order at 30.

In general, had the Office been aware that the Work had been *published* prior to registration, the Office would have refused registration because the unpublished collections option is limited to unpublished works.  But Archie's *licensing* of its animations to Elsevier does not, in and of itself, resolve the question of whether the particular work at issue here—Cellular Differentiation— had been published.

As an initial matter, as the Office understands the undisputed facts, the Work was in existence and delivered to Elsevier at the time the parties executed the licensing agreement in July 2005.[28] But Archie's delivery of copies of the Work to Elsevier does not alone resolve the issue of publication.  First, it is not clear whether Elsevier should be considered a "member of the public" under the "distribution" prong of the statutory definition.  As the Office understands it, Archie asserts that the Work was delivered to Elsevier on the understanding that Elsevier would subsequently package those animations into larger publications for distribution to the public at large.[29]  If true, it may be that Archie's delivery of the Work to Elsevier is more akin to a writer's delivery of a manuscript to a book publisher; such a delivery would not constitute publication but would instead be considered a "limited publication," as discussed above.  Elsevier does not appear to dispute Archie's argument that publication had not occurred under the "distribution" prong of the statutory definition.[30]

Second, under the "offering to distribute" prong of the statutory definition, the statute by its terms requires the offering to a "group of persons" for purposes of further distribution to the public, public performance, or public display.  Here, it is unclear whether the Work was offered or delivered to anyone else besides Elsevier before the registration application was filed.[31]  If, as Archie asserts, Elsevier were the only entity to whom the Work was delivered,[32] such delivery would not qualify as publication under the "offering to distribute" prong, because the Work would have been delivered to a single person rather than to a "group of persons."  For its part, Elsevier notes that Archie was "actively promoting . . . its then-existing animation library to potential clients" prior to the execution of the license agreement.[33]  Without knowing more, it is difficult to say whether those promotion efforts should be considered offers to distribute

---

[28] The Office bases that understanding on the Order's statement that the relevant registration application for the Work included "animations [Archie] had licensed to Elsevier," and that future registrations also covered "animations that [Archie] had previously delivered to Elsevier."  Order at 4.  If, contrary to that understanding, the Work was created and delivered *after* the licensing agreement was signed, but *before* the registration application was filed, there would be no question that the work was unpublished and that it was therefore properly registered using the unpublished collections option.

[29] Archie MD, Inc.'s Opp. to Elsevier, Inc.'s Mot. for Summ. J. at 17-18 (Jan. 25, 2017).

[30] Def. Elsevier, Inc.'s Reply In Supp. of Its Mot. For Summ. J. at 3-5 (Feb. 1, 2017).

[31] Although the Order observes generally that "Archie licenses [its] animations to educational and commercial entities," it does not provide any further detail with respect to the Work at issue here. Order at 2.

[32] Archie MD, Inc.'s Opp. to Elsevier, Inc.'s Mot. for Summ. J. at 18-20 (Jan. 25, 2017).

[33] Def. Elsevier, Inc.'s Mem. of Law In Support of Its Mot. for Summ. J., at 12, n.8 (Jan. 11, 2017).

"copies . . . to a group of persons for purposes of further distribution," or whether they were a form of limited publication akin to an author shopping a manuscript to potential publishers.[34]

Elsevier also argues that the delivery of a work to a single entity can constitute distribution to a "group of persons."[35]  Although that position finds some support in the Ninth Circuit's decision in the *Bagdadi v. Nazer*,[36] the Office believes that a better reading of the statute is that a business entity should be treated as one "person," consistent with general understanding of the term "person" when used in federal statutes.[37]  Indeed, the legislative history explains the operation of the "offering to distribute prong" as follows: "when copies or phonorecords are offered to *a group of wholesalers, broadcasters, motion pictures [sic], etc.*, publication takes place if the purpose is 'further distribution, public performance or public display.'"[38]  Given that explanation, the Office doubts that Congress also intended a single wholesaler or broadcaster to qualify as a "group of persons."[39]

Moreover, even assuming the Work was offered to a group of persons, the Work would be considered published under the "offering to the public" prong only if it was "*ready* for further distribution, public performance, or public display."[40]  The Office understands Archie to be asserting that the Work was not immediately ready for distribution at the time it was offered to

---

[34] *See* COMPENDIUM (THIRD) § 1905.1 ("Sending copies of a manuscript to prospective publishers in an effort to secure a book contract does not constitute publication.").

[35] Def. Elsevier, Inc.'s Reply In Supp. of Its Mot. For Summ. J. at 3 (Feb. 1, 2017) (citing *McLaren v. Chico's FAS, Inc.*, 2010 WL 4615772 (Nov. 9, 2010); *Bagdadi v. Nazar*, 84 F.3d 1194, 1198 (9th Cir. 1996)).

[36] *Bagdadi*, 84 F.3d at 1198 ("[B]ased on our interpretation of the plain statutory language, we agree with the district court that the Linguex School was a 'group of persons.' The Linguex School consisted of multiple teachers and students, and it was open to members of the public who wished to engage in the study of English.").

[37] *See* 1 U.S.C. § 1 (providing that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.").

[38] H.R. REP. NO. 94-1476, at 138 (1976).

[39] The decision in *McLaren v. Chico's FAS, Inc.*, 2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010), is not to the contrary. In *McLaren*, the key issue was whether the plaintiff had published a drawing used to create mannequins prior to November 4, 2000.  *Id.* at *2.  The court noted that, in December 1998, plaintiff had licensed the mannequin drawing to another company, Pucci, so that Pucci could produce and sell mannequins based on that drawing.  *Id.* Although not made explicit in the court's opinion, it also appears from the underlying record in the case that Pucci had actually created and sold the mannequins themselves in 1998.  *See McLaren*, Def.'s Mot. to Dismiss at 7 (July 9, 2010).  Thus, in *McLaren*, publication had occurred under the "distribution" prong of the statutory definition, and the court had no occasion to interpret the "offering to distribute" provision.  *See McLaren*, 2010 WL 4615772, at *2 (noting that "the publication of the derivative work, to the extent that it discloses the original work, also constitutes publication of that underlying work." (quoting *Shoptaik, Ltd. v. Concorde–New Horizons Corp.,* 168 F.3d 586, 591 (2d Cir.1999) (internal quotation marks omitted)).

[40] COMPENDIUM (THIRD) § 1906.3 (emphasis added).

Elsevier.[41]  Elsevier, in contrast, appears to argue that the Work was offered in final form "on the day the 2005 [licensing agreement] was signed."[42]

The Copyright Office is not in a position to resolve the factual disputes described above, and for that reason cannot definitively conclude one way or another whether it would have rejected the registration application at issue here.  The Office has, however, set forth the basic legal principles and various possibilities based on the record in this case, so that the Court can have the benefit of that advice as it assesses the record and resolves this dispute.

Dated: June 14, 2017

Karyn Temple Claggett
Acting Register of Copyrights

---

[41] Archie MD, Inc.'s Opp. to Elsevier, Inc.'s Mot. for Summ. J. at 18 (Jan. 25, 2017).

[42] Def. Elsevier, Inc.'s Mem. of Law In Support of Its Mot. for Summ. J., at 12 (Jan. 11, 2017).